Case No. 14-1039. FiberTower Spectrum Holdings, LLC. FiberTower Corporation Appellant v. Federal Communications Commission. Mr. Shaw, for the Appellant. Ms. Flood, for the Athlete. FiberTower Spectrum Holdings, LLC. Good morning. Good morning. May it please the Court that I speak, Shaw, on behalf of Appellant FiberTower. This appeal involves the FCC's cancellation for lack of substantial service of 689 licenses owned by FiberTower in the previously undeveloped 39 GHz and 24 GHz bands. It is beyond dispute that FiberTower's extensive spectrum development activities, which typically represent about 90% of the ultimate cost of establishing transmission, included construction and operation of links on at least 42 of the licenses at issue. Is your argument on those 42 that those 42 licenses should have been extended, simply? Or is your argument that the progress on those 42 should affect the Commission's view of the remaining licenses? Both, Your Honor. To take your first piece, the 42, we think that that is the most clearest form of error because the Commission itself, in its opinion, said that it did not intend to cancel any license on which FiberTower had reported construction. It says this on footnote 7, paragraph 3 of its order, JA591. It says it again on JA606, paragraph 33 of its opinion. The Commission is quite clear it does not want to take any action in this order against the license on which FiberTower has reported construction. On the broader question, do you have any Commission press report indicating that in a question issue of sort of mass license renewal, that a high level of performance on a, whatever it is, a little less than 10%, I guess, of the licenses should flow over to the others with respect to which there is not an understanding of progress, but a different kind of progress? Your Honor, I wouldn't make that argument as to the substantial service showing, which is a license by license showing. I admit that that is a tougher argument. I would make that argument, however, to the waiver and extension relief. What the Commission did here is it treated the waiver and extension analysis en masse. It was an omnibus rejection of waiver and extension relief. One of the important predicates for its denial of waiver and extension relief was its assumption that FiberTower had not built out at all on the 689 licenses at issue. Therefore, the Commission essentially portrays, characterizes FiberTower as essentially sleeping on its rights. If the Commission, however, had recognized the construction on the 42 licenses at issue, it would have fundamentally altered the way it characterized FiberTower. Can I ask a question about that, which is that there were 10, I think there were 10 licenses as to which there was construction. Yes, Your Honor. Everybody agrees on that. Yes, Your Honor. Although the Commission has withdrawn three of those, even three of those in subsequent proceedings that are not at issue here. Okay. I don't know that we know about those. Maybe we were made aware of it and I glossed over it. At least as of the Bureau's ruling and then the Commission's affirmance of that, there were 10 as to which everybody agrees that there was some construction. Therefore, both the Bureau and the Commission take those out of the field of vision. That's right, Your Honor. Don't terminate us to those. Two questions about that. First, was the showing that you made with respect to the additional 42 the same as the showing you made with respect to the 10 so that what appears to have happened is essentially just an oversight for some reason because they were looking at the same source of documents but didn't notice it? Then the second piece of it is if on your waiver and extension argument, if we already know that there was 10 as to which there was construction but then waiver and extension was denied anyways, then why do we think there's going to be something different as opposed to an additional 42 because we're not at a Boolean variable where we go from none to some? Sure. Okay. Let me take your first piece first, which is was there anything different? There was nothing different in the way that FiberTower described the construction. If you turn to the JA, it's sort of easiest to see on the document. These construction notifications were listed in the same place on each of the 689 plus the 10 that you mentioned, so the 699 applications. They were listed in the same place of each renewal application. There's samples of these in the JA. The JA87 is a representative of these. Then the next 40 pages of the JA, you'll see, have the exact same page for each of the licenses. What you'll see is if you read, it says the substantial service showing has been met. That's in JA87. Then the second sentence is as of the date of this filing, FiberTower so far has one link built and operating at a school in Kansas City, Missouri, the geographic area of this metropolitan area in the next sentence. That is exactly the same sort of sentence it had, even in the 10 that were. No difference in that. The only difference I would say is in those 10, there was a colorable argument that FiberTower had met the safe harbor because there was enough links. There was a safe harbor of four links per million. If you did the math in those construction notifications, there was a plausible argument that FiberTower had met the safe harbor in those 10. FiberTower doesn't contend here in the 42 at issue. Did you make the contention in the other 10 that you did meet the safe harbor? Yes. There was a sentence that said, it was an extra sentence that said FiberTower has met. That may be, we'll ask the commission, but that may be the explanation as to why the commission noticed the construction with respect to those 10, but not with respect to this one. That may be, but whether it's safe harbor or not, the commission clearly says in its opinion, no construction whatsoever. Even in its appeal brief here, after we pointed out and cited these sentences in the 42, it says no less than a half dozen times in its appeal brief that there was no construction, no service whatsoever. That's just not accurate based upon these identical filings which are in each of these applications. The commission takes the position that in your petition for review, you never told them what license you were talking about. Sure. Again, I think the easiest thing is to turn to the petition for review. I know. It says, the record shows that there has been construction. Exactly, Your Honor. On page 23, I guess there are two parts of it. One is, did we show the issue? Then the second is, how specific were we in doing it? The first part is, was the issue presented? To that, I don't think that there's any doubt. That's at JA page 560, which is page 23 of the application. You said the record shows. Right. Then they cite cases not quite in their time. Right. On page 23... My question is, why didn't you just tell them which licenses you were talking about? Your Honor, if we would have done that, that would have made this a little bit simpler. Let me talk about what we did do to preserve this issue. First is... Was there any reason not to? Your answer to Judge Srinivasan suggests maybe there was. Certainly, yes, Your Honor. When these licenses are submitted, they're submitted on the URL system. They're submitted to the commission. The commission then has a statutory duty to make the renewal. It looks at that specific page of each construction notification that I cited to in the appendix. It does that. That's how it found those other 10. We know that the commission knows where to look to find the information. It's the expert agency in charge of doing this. I get that. Just referencing the record is enough to force the agency to go back through the 600-odd licenses. Yes, Your Honor, but I would put a caveat on that. This is not just you state the issue and then leave the agency to comb through tens of thousands of pages. What we have here is we've stated the issue in an argument heading, no less, and then had an argument section about it. But the commission knew exactly where to go in those licenses. It didn't have to comb tens of thousands of pages. It had to look at the one sentence in each application. It had to do it 600 times. It had to do it 600 times. But if you look at page 87, it literally takes a few seconds to read each one of those sentences. It's in the same spot on each application. I just say, for the life of me, I couldn't understand why counsel just didn't identify it. Your Honor, I wasn't agency counsel. I don't know that the commission did. I assume you had a reason for not doing it, all right? Right. Was there a word cap? Or was it just filing limited in some way? There were. I believe there were. I don't know, actually, the application for review in front of the commission, what the word limitations were or whether they were rubbing up against it. But what is clear is if the commission had done what it did with respect to the 10 that you mentioned, and, in fact, the commission's own order, paragraph 6, footnote 27, cites the very same page of the license application that I directed you to in the Joint Appendix, the commission clearly knew where to look, and the commission's own touchstone of substantial service. Even if we accept that it's a construction-only test, then the one thing that you would expect the commission to look at out of all of these documents is the one sentence in each application that specifies the degree of construction. The commission, whether they did that or not, they clearly missed, and I don't think there's any dispute about that here, they made a manifest factual error. They missed. On 42 of the licenses at issue, they missed the construction that had been reported. So in the 10 they found, you actually said on this same document, we have met the safe harbor. Just in the sentence before it. That's right. That's right. Otherwise identical. They did a word search for safe harbor. I don't know. No, I mean, I'm just trying to figure out what happened here. I don't know. Maybe the FTC might be in a better position to answer that. Whatever happened is the 42 were missed. Now, to connect that to the second part, why does that mean that you not only vacate us to the 42, but also you look further, and that goes back to the waiver extension analysis. If you read the waiver and extension, in fact, the commission's order, the overwhelming perception that they paint a fiber tower is here's an entity sleeping on its rights. It's not building out on a meaningful number of its licenses. Now, I put the 10 aside in which they made a safe harbor showing. I think it would have changed the way it portrayed fiber tower if you had accounted for the 40. But with respect to the 10, you didn't make a safe harbor showing, right? So with respect to those 10, they didn't find, they didn't decide not to terminate those based on the conclusion that you met the safe harbor requirement. I take it they decided not to terminate those because there was construction. Well, Your Honor, the commission never issued an order. As to those, those are simply still valid. So we don't know the rationale as to why. So they may have accepted your argument that you've met the safe harbor. Yeah, we don't know. The FCC may have other insights, but there isn't a published opinion about those 10. So I can't speculate as to what happened there. But what I can say is repeatedly in the commission's order it says fiber tower chose not to build. If it would have accounted for the 42 license at issue, that would account for almost 25% of the 24 gigahertz licenses. I don't think if the commission had known that on about 25% of the 24 gigahertz licenses, that fiber tower had actually built out, that it would have said, even where market demand existed, fiber tower did not build at all. It fundamentally changes. The waiver and extension analysis is, in part, an equitable inquiry. The commission painted fiber tower as simply not acting. I think it fundamentally changes the equity if you had known that there were 42 other licenses in which the fiber tower reported construction in 25% of the 24 gigahertz license. You must be taking the position that there's a meaningful delta between 10 and 42 because they knew that as to 10 there was construction. In fact, it may have even been enough construction to satisfy the safe harbor. Yes, Your Honor, I do think there's a meaningful delta because, again, if you look at the way the commission worded its waiver and extension analysis replete with this idea that even where demand existed they didn't build out, I don't think the commission could have said that if they had seen that on a quarter of the 24 gigahertz licenses, which they would have seen had they looked at the 42, that fiber tower had, in fact, built out when no other licensee had built out anything at all on the 24 gigahertz band. Were the 10 also on the 24 gigahertz band? They were primarily on the 39 gigahertz band, but I would have to go back and check if there was any of those 10 where I don't believe they were. I believe those were all 39 gigahertz. They at least knew that there was construction as to those. They didn't know that there was construction as to those. We simply put that out of its mind in terms of its order here, and I think at the very least one would think that we would want to give the commission a shot at doing the waiver and extension analysis on an accurate depiction of the record that took into account all of fiber tower's activities, including but not limited to construction. Let me ask you, because the argument to the commission was this 90% argument, and I'm just summarizing, but we've done all this preliminary work and it shows that we're not just warehousing, et cetera. So the commission says, well, we told you back in 2008 that that wasn't going to do it, that we need actual construction, and it addressed your argument about its rule and its interpretation of the rule saying, no, we've always required construction. So then your argument to the commission is it ought to look at its rule differently and it ought to change that interpretation. No, Your Honor. I guess it would be what you consider as the original point. We would consider the original relevant point is the promulgation of the rulemaking itself. And talking about flexibility. Talking about flexibility. And the commission tells you what it means back in 2008. The commission then construes its substantial service requirement as requiring construction in 2008. We think that's in conflict with the commission's description of that requirement when it actually promulgated the rule, and then, of course, under established admin law presence. You look at what they did at the time they promulgated the rule, and they can't change their interpretation. But let me add another point to that that you brought up. The commission told them in 2008 that all that other stuff wasn't enough. There's one significant piece of that other stuff that wasn't around in 2008, but that was around in 2012, and that's the spectrum in a box program. I think it's easier to talk about this stuff more concretely rather than just construction and activities. Let's take spectrum in a box because I think that's a quintessential example of the type of innovation that FiberTower was doing. Now, to be sure, spectrum in a box, just to refresh your memory, spectrum in a box is essentially the equipment and technology that FiberTower developed with partners that allowed a customer to simply purchase a standalone system including the equipment needed to set up a link, and it would come with the rights to use FiberTower spectrum. It was essentially a ready-to-deploy system. You bought it. It had the equipment. It had the spectrum. You hook it up, and you're ready to go. Now, to be sure, that does not fall under the traditional rubric of construction and transmission, which has you building up a network, building up links on different cell towers, for example, and then waiting for the customers to come. What this has is you build up the system. It's ready to deploy. You wait for the customer to do it. Now, the reason we think that that's precisely the sort of service that the commission had in mind when it promulgated the 39 gigahertz order is based upon the text of the 39 gigahertz order itself. If you look at paragraph 42, what it says is the commission is moving to this more flexible regime precisely to allow services to develop in ways that the commission cannot predict. And then in paragraph, and we think spectrum in a box is exactly that sort of service that the commission could not have predicted and wanted to allow that sort of service to be recognized. If you look at paragraph 45 of the 39 gigahertz order, and we think this paragraph is absolutely crucial, paragraph 45 says, look, these bands, the 39 gigahertz band in that order, are different than other traditional bands here. And the reason, one reason why they're different is you can't just go and build up links wherever and turn them on and expect them to work. It requires precise location of equipment based upon a customer demand. That is, often the link won't be placed until a customer has placed an order. This is recognized in the text of the 39 gigahertz order in paragraph 45. Spectrum in a box is precisely an answer to the problem that the commission identified in 1997 but didn't have a solution to. So it said we're going to allow this flexibility to allow service to develop in ways that we can't predict. Spectrum in a box is functionally identical to the traditional network, except first you have a customer actually place the order, and then the system is turned on. It's equivalent, I don't see any functional difference, Your Honor, between putting up a link, flipping it on, having the radio transmit, and wait for a customer to come to that link than simply having the system ready to deploy, have it ready to go, wait for a customer to purchase it, and then have it come up. In both circumstances, you're waiting for a customer to come to actually make use of the link. It's just that in these bands, in order to make full utilization of the technology, you need to know exactly where to put the equipment. And rather than just simply build up an extreme cost, build up links in places where you hope customers might show up. And so Fiber Tower came up with this innovative technology in order to address that concern, providing service. And we think that the commission, in turning a blind eye to that, that if you don't have traditional construction and transmission, we're not even going to look. You could be the world's greatest innovator and come up with the most innovative ways of providing service. We're just not going to look at it unless you do it. We think that conflicts with the 39 gigahertz order at the time of promulgation. On the argument of whether the commission wanted Fiber Tower to do, it says, well, we had just this sort of thing going on by Fiber Tower in 2008. So the thing we're asking for, there's no reason to think that it would be a safe bill or links to nowhere, et cetera. So you reply to that by saying, of all licenses are the same, of all times are the same, which is undoubtedly true, but is your distinction of the links provided in 2008 precisely this spectrum in a box alternative or what? If we needed to make a showing beyond what we made in 2008, then what I would point you to is, yes, the spectrum in a box technology. That was not around in the 2008 showing. It was around by the time of the 2012 showing. So what might have been, I think, a logical investment in 2008 by 2012 that ceased to be a logical investment. Is that a fair characterization of it? Your Honor, I think what may have been reasonable investment at the beginning of this spectrum, people figured out that the market demand didn't materialize in the way that everyone thought, including the commission and including every industry participant that provided views in the commission, confirmed this. And so then the question was, okay, well how do you build up this network? If the market demand isn't materializing in the way that you can just go out and build up links all over the place and wait for customers to come, how do you go about doing this? So one of the things that Fiber Tower came up with is a spectrum in a box technology. There are other things as well. Now in the 42 licenses that were reported, that was a mix of sort of construction. It was the traditional sort of links that you just put up that had been put up before. It was the spectrum in a box technology. Those were more of the recently finalized leases. There were 111 links operating on those 42 licenses that the commission made no mention of in its waiver and extension analysis. On top of those 111 links, if you look at the same paragraph and the same place in every license application, there were at least 55 and counting more links that were going to be put up imminently pursuant to finalized leases. They just hadn't been built yet. The paperwork had been done. But your argument is the 42, S to the 42, is independent of spectrum in a box because It's independent of spectrum in a box. This is a broader substantial service argument that they were also providing substantial service apart from actual construction. Even under the commission's test, accepting it full stop, the 42 would show construction. Can I ask you a question about the commission's test of actual construction? Yes. On the question of whether it's consistent with the way the commission had been characterizing the inquiry in the past, there is this regulation, 47 CFR 101.3. Yes, Your Honor. It's in the addendum to the commission's. Now, the commission's addendum doesn't have pages for some reason. I'm not sure why, so I can't point you to a page. It's at 47 CFR 101.3. The first definition is 24 gigahertz service. Yes. Then the way it goes on to describe 24 gigahertz service is a fixed point-to-point, point-to-multipoint, and multipoint-to-multipoint radio system dot, dot, dot, consisting of a fixed main nodal station and a number of fixed user terminals. This service may encompass any digital fixed service. And so I don't have the requisite technical expertise to understand every jot and tittle of that, but it sounds like that's speaking about an actual link. Yes, Your Honor. And Spectrum in a Box provides an actual link. It's also a point-to-point or a point-to-multipoint system. The only difference, Your Honor, is that what the commission's construction and transmission requires is that you build the link first. Right, and this is consisting of a fixed main nodal station and a number of fixed user terminals. That's right. So you build the link first, and then you turn it on, and then customers come. That's kind of the only difference between that and Spectrum. Spectrum in a Box is also a point-to-point system. It's a radio system. It satisfies all those criteria. Well, does it have a number of fixed user terminals? Well, as soon as it's put up, it does. Right, but until it's put up, it doesn't. No, until it's put up, it's in a box. And then you buy it, and then you put it up, and it's ready to go. And then it is a point-to-point or point-to-multipoint system, radio system that provides all of those things. So we think that functionally it operates quite similarly, and when the commission said this service is going to evolve in different ways and when the commission said that, in fact, in this sort of Spectrum, you may need to sometimes wait for a customer to place in order to figure out the right location, we think that's all of one piece with that, and that the commission should not, at the very least, the commission simply shouldn't disregard that sort of technology, shouldn't disregard all of the other forms of investment that FiberTower made until it shows one traditional link, construction link. And even if that's true, even if all that's true, here we have at least 42 different licenses, apart from the 10 that you mentioned at the beginning, which do show that very traditional notion of build up a link. So put the 42 to one side, because I think the 42, you would say, I think seems to satisfy this definition, because there are fixed user terminals in existence already. So one way to describe this semantically,  between service that's ready to be used in a box and service that's actually in existence, but there is at least a distinction. And so you could describe one as potential service and the other one as actual service, and then just accept that terminology for now, even though I take the point that you would say actually they're both actual services. So if that's true, then there at least is, and if the commission had clearly stated at some point that we're drawing a distinction between potential service and actual service, and for actual service, we mean working links, then you'd be out of luck as to everything but the 42. Yes, under the commission's test. That's right. But not on substantial service, but not on waiver and extension relief, and that goes back to my earlier argument that the waiver and extension was predicated on the commission's equitable judgment that fiber tower is essentially sleeping on its rights. We think that would have been different. At the very least, we think the commission should have a chance to reevaluate its equitable analysis on a full and accurate record of what fiber tower had actually been doing, including construction on the 42, on a quarter of the 24-gigahertz license. The other part of the waiver and extension relief that doesn't have to do specifically with the 42 licenses, but I think if the court were to vacate on that basis, I think it would be helpful to also provide some guidance. There were two parts of the equation to the waiver and extension analysis. One is, was fiber tower sleeping on its rights? That is, using the exact words of the commission, did fiber tower choose not to build even when market demand existed? That's the first part of the equation, which we've already talked about. The other part of the equation in the waiver and extension analysis is where market demand existed. That is, the commission takes the view that there was sufficient market demand to support this buildup of ranks in all of these different markets. We think that that is flawed on four bases, and we think if the court were to vacate, it should point this out to the commission so that when it redoes its waiver and extension analysis, it has this in mind. First, the first piece of evidence is, you don't have to take fiber tower's word for it that there wasn't sufficient market demand. Every industry participant, that includes wireless carriers, industry groups, equipment vendors, that submitted views before the commission that took a position supporting relief for fiber tower on two bases. One, that fiber tower, some of them said fiber tower is the best position of any licensee to develop these bands. So looking at the perspective, waiver inquiry, that would satisfy that. But the other thing they said is, the market for the 39 and 24 gigahertz bands has not grown to the extent that they or the commission predicted. This is opening brief, our opening brief, pages 16, 19, and 48, cite all of the industry comments. They're all in the JA, you can look at them. The other material part of the industry comments is, not a single competitor filed that says, hey, look, you should cancel these licenses because we can make better use of them. In how these commission proceedings work, if a third party actually wants to use the licenses, the time that they come in is at the renewal proceeding and they can make a competitive showing. It's like, we think it's telling of the market demand that there was not a single competitor that came in and said, no, actually, we can make better use of the spectrum that there was customer demand. The second piece of evidence I'd point to on that market demand side of the equation is that no other 24 gigahertz licensee at the time had constructed any operating links on the system. Fiber Tower was the only one, and in fact did it on about 25% of its licenses. Can you just describe, for those who don't have the technical expertise that you and the commission do, what exactly had to happen to turn the spectrum in a box into a working link? Somebody buys the box. You're charging for the box. They pay for the box. It comes paired with the right to use the spectrum, so they have those rights. Then it has to be installed. There were different systems within the spectrum and box. Part of the spectrum in a box system were these small, you might have recalled from the brief, the description of small cell equipment. This was kind of innovative equipment, especially for congested urban areas. It would simply allow you to connect the system up to something as skinny as a pole, so you could imagine if you had a link between, say, two buildings, a point-to-point link between two buildings, and there's pictures of these on the record, but they're essentially a skinny pole, and you attach the unit to the skinny pole, and then, of course, this exceeds my technical expertise. I don't know what else has to exactly happen in terms of you probably need some line of sight, and these other things have to be set up in a way that you can transmit the signal in a way, but that's it. You set the system up. It comes with the rights. It's a portable unit. It becomes mounted, and then it provides service. The difference between it and standard provision is that with standard provision of links, you build towers, things like that, and market it. Presumably, you've done some preliminary marketing. Here, you build boxes. Before anything goes out to anybody, then it's marketed box by box. That's right, Your Honor. That's the difference. It's marketed box by box. If I'm hearing you correctly, you're saying that an inventory of boxes ready to market and marketing efforts is as much as one can do using this technology. Yes, Your Honor. We think that that was... If Farm Tower was a market leader, that was the judgment that they made as to the best way to implement this technology. It's supported by the Commission's own 39 gigahertz order. It's supported by the industry comments. Of every industry participant that provided comments to the Commission, the Commission doesn't provide any countervailing industry comments that suggest that, no, this wasn't the right way to go about implementing the market. Let me go back to the Commission's reliance on construction by Farber Tower in 2008. I asked you about that. I invited an answer to that on my last round. That was totally open-ended. What is Farber Tower's distinction of those construction... Your Honor, so... That may have been fine, but today, 2012, what happened in 2008 would have been saved bills. Okay, so in 2008, there were a certain number of the licenses which the Commission said you satisfied substantial service on. The majority of them, they said, we'll give you an extension or waiver until 2012. So the ones on which they had satisfied substantial service in 2008, they had actually built up links because in certain markets, there was sufficient demand, right? So this is a market-by-market sort of license. So in those markets where there was sufficient demand for the traditional type of infrastructure bill, Farber Tower did it. The Commission said, fine, substantial service. Those are off the table now. Those are fine. As to the other ones where you didn't build links, extension and waiver to 2012, Farber Tower said in 2008, hey, look, we've done all these other things. We've invested in equipment development. We've set up the construction platforms. We've done all these things. But the Commission says, as Judge Rogers has pointed out, look, you didn't actually operate, construct and transmit the links. That's not good enough. Come back in 2012 with that showing. Farber Tower comes back in 2012. Now, between 2008 and 2012, what didn't happen is what everyone expected, including Farber Tower, including the Commission, is the demand did not materialize. Everyone expected that wireless carriers would be rolling out 4G technology. That would create demand for the type of fixed wireless backhaul services that these bands are used to provide. That simply did not materialize on a nation. There were certain markets where it did, and in those markets, Farber Tower built. But as a nationwide matter, it didn't. And that's what I was talking about when I said the four pieces of evidence that shows that the Commission misjudged the other side of the equation between 2008 and 2012. I already talked about two of them, the industry comments, the fact that no other 24-gigahertz licensee built out at all. The third is that most of the 39-gigahertz licensees did not build out at all either. In fact, about two-thirds of the non-Farber Tower licenses were returned to the Commission. And there has not, even since that date, how many years have passed, the Commission has not reissued, our understanding is, the Commission has not reissued a single one of those licenses. Tellingly, just in October 2014, so after all of these orders were already rendered by the Commission, the Commission put out a notice of inquiry, and this was cited in our reply brief, proposing partial repurposing of the spectrum to allow for other sorts of services, including mobile, wireless, and those other things. We think that's at least an implicit, if not explicit, acknowledgment that the market had not evolved in the way that the Commission and everyone else thought it would. The last piece of evidence I'll point out is, of the 39-gigahertz licensees that did build, a good portion of those were saved bills. Now, we realize there's a dispute in the record about when those were brought to the Commission's attention. At the very least, they were brought to the Commission's attention at the reconsideration stage. Reply brief pages 24 to 26 of our reply brief, short of probably in more detail that you want to know, kind of point out why those builds were actually saved bills and not of the type that were able to provide service. The Commission, in its order, does not dispute that. It never says that, oh, no, we've looked at these things, and they were actually providing service to customers. These were meaningful builds. These were not antiquated radios. You know, our submission showed that those licenses, the construction notification for those licenses, as a matter of physics, simply could not have provided the service that was claimed in those, and so we think those were saved bills. Those were saved bills on a level of detail. Those were saved bills by IDT. IDT had virtually all of the 39-gigahertz construction notifications at the relevant time,  finding that those were, in fact, viable service builds rather than saved builds. So when the Commission focuses on service to the public, I understand your argument about why it's a short-sighted view, but until people buy these boxes and hook them to a pole, there is no service. The Commission has drawn that line. Your Honor, that is the line the Commission has drawn, but we think that line, as I said, conflicts with the line that the Commission had contemplated in its 39-gigahertz order. In the order itself. In the order itself, and so that would be the basis for our substantial service argument. Of course, our other argument on waiver and extension analysis doesn't fall on that line. Is the box a lot more expensive? This is outside of the records, but I did ask how much one of these boxes cost. My understanding, it varies. I want to say $1,000. No, no, no, no. I want to say $20,000 sticks out in my head, but I might be misstating. I was just trying to think if there was some barrier to the use of these boxes. That's all. You know, $15 billion per box. No, no, no, no, no. These are meant to be used. There are varying types of services that are provided in these boxes, but these can be bought by, for example, a university that wants to beam service in between different buildings. So it's not $15 billion. It is not $15 billion, Your Honor, and there is no Eighth Amendment claim. Your Honor, an ordinary building with links, it's inherently customer-specific? It is, Your Honor, because a particular customer buys the Spectrum in a box equipment and then it's mounted according to their needs and specifications. In a conventional area, the actual getting of service is customer-specific, but the construction is not. That's right. You would, for example, put up a link on a cell tower to provide, but if it happens to be that the customers in demand aren't, they don't need service from that cell tower, you may have built in a link in a place where it's not being used, so you want to put them in places where they're used. Let me just, before we sit down, on whether the Commission's interpretation is consistent with what the Commission did before. So you've identified the portions of the orders that you think give rise to the best argument that there's an inconsistency. Then we also have the regulations, which we should look to as well, I take it. And on the regulations, so I identified the one already about the definition of 24 gigahertz service, and then there's also 101.527. And 101.527B1, in discussing substantial service and what the applicant needs to submit, says each licensee must have a minimum file of report maps and other supporting documents describing its current service, so we take this to be current service, in terms of geographic coverage and population served to the Commission. Right. So when I speak in terms of population served and geographic coverage, that seems to indicate population that's actually being served, not population that might buy a box that could then result in service. So we think that regulation is crafted towards the traditional construction and transmission paradigm, in particular to allow a licensee, for example, to make the safe harbor showing, right? You can make the safe harbor showing, showing you, you know, provided four links per service. But the regulation also includes language not limited to that information. That is, you can show other things that would allow a Commission to make a determination of substantial service. You're not limited to just showing the actual operation of service. If not, it doesn't limit you to that information. You're certainly invited, in fact, required to show other things that would give that indication of service. And so we think... So one way to read that is to say that the first sentence that I quoted from tells you what current service means. Yes. And then you're right. It goes on to say the report must also contain a description of the licensee's investments in its operations, which I think is what you're referring to. So it might be that you have to have some service, current service. And then if you have – if you can show sufficient investments, then you'll satisfy substantial service. But it's not in derogation of the requirement to have current service to begin with. In other words, it seems to be drawing a distinction between what's service and what is other stuff that could go into an assessment of substantial service. Your Honor, I'm just looking at the actual text of the language here. So I was looking at B1, describing its current service in terms of geographic coverage and population served. Yes, Your Honor. So if our view is if a licensee satisfied that, for example, it could make a safe harbor showing just based upon that. But we don't think that that is an exclusive way to show substantial service. In fact, if you look again back to the 24th universe order at the time they promulgated the rule, they said, yes, safe harbor is a way to show substantial service. You make the types of showings here. But you can prove substantial service in other ways. That's what the regulation verbatim says – or the order verbatim says. Now the commission has read into the in other ways in other ways that also show construction. But we don't think that that is supported by – the reason for those regulations is that if you read those orders as a whole, what they're trying to do is move away from construction to allow for more flexibility. But it doesn't seem inconsistent with what the commission is saying to say that – yes, I take your point. That's one interpretation is that you don't need any current service or construction. I'm equating current service and construction. Okay. You don't need any current service or construction at all. You can get home all the way based on investments and potential service. But – and you can also get home all the way if you have the requisite baseline level for substantial service under the safe harbor. So you need four per million. But if you're less than four per million, you still have to have some current service. And then you can also – so you have a little bit of current service that's less than four per million, but then you show investments to get you to substantial service. Sure. That is the commission's view that you don't look at anything. You don't look at any investment. You don't look at any innovation until you have that construction. And we think that's an overly narrow interpretation. It's overly narrow. Okay. Of the orders. Okay. All right. Let us hear from the commission. Thank you. Thank you. We'll give you some time on this one. May it please the Court, my name is Maureen Flanagan. Here this morning on behalf of the Federal Communications Commission, I'd like to start with the 42 licenses. It's our view that the 42 licenses are not before the Court. Fiber Tower identified those 42 licenses for the first time in its opening brief in this Court. It did not identify those 42 licenses in the proceedings before the agency. I'd like to read the text of Fiber Tower's application for review, which you can find cited at page 16 of Fiber Tower's reply brief. Fiber Tower argues that it preserved its argument with respect to the 42 licenses based on this language. The Bureau erred as a matter of fact when it found that no facilities had been built out in Fiber Tower's license areas. The record demonstrates that as of June 1, 2012, a significant amount of construction had occurred in many of Fiber Tower's license areas that the Bureau identified for termination. That language does not identify any particular license, nor does it describe the facilities that were allegedly constructed. If Fiber Tower fully concedes, substantial service determinations are made on a license-by-license basis. So, for purposes of Section 405 of the Act, if Fiber Tower was to identify an error made by the Bureau with respect to any subset of those 680 licenses, it was Fiber Tower's obligation to identify those licenses in its application. So can I ask you this? When you read that sentence, does it at least indicate to you that there may well be some individual licenses as to which there was construction? It does indicate that, Your Honor. But as the Commission pointed out in footnote 133 of the Order on Review, it was unable to grapple with this argument because Fiber Tower, again, did not identify any specific license where the Bureau allegedly erred with respect to the substantial service showing. How many minutes would it have taken to see whether such assertions were in license-by-license? I don't know how many minutes, Your Honor. There were 689 substantial service showings. Each one was 20 pages in length. Is this all searchable? It's searchable, Your Honor, yes. But this Court in Bartoldi-Cable held that the Commission need not sift through pleadings to identify arguments that are not specifically made by commissioners. The argument is made. It's not a matter of sifting through pleadings to find the argument. The argument made in the argument's application is certainly less clear than one would like. Arguably, Your Honor, we would have to sift through pleadings because there were 689 substantial service showings. Fiber Tower doesn't even tell the Commission that this argument affects 42 licenses, 10 licenses, 15 licenses. It would have required the Commission to go through each and every one of those 689 substantial service showings again. Now, Judge Rogers, you asked the question and I think this is a very good one. If Fiber Tower thought that the Bureau erred with respect to those 42 licenses, why didn't Fiber Tower identify those licenses in its application for review? Moreover, if Fiber Tower thought that the Commission erred in affirming the Bureau in the order on review, why didn't Fiber Tower identify those 42 licenses in its petition for reconsideration for the agency? There's no doubt that it would have been much, much better if they would have identified the 42. I think we would all be looking at a different equation. I think the question is, what else could they, are you suggesting that they weren't talking about the 42 when they have this sentence in there? What I'm suggesting, Your Honor, is that before the agency and before this Court, Fiber Tower's view is that it doesn't have to demonstrate any construction or any service to meet the substantial service requirement. I think this argument is that they're saying that even if you assume that you do have to meet a construction requirement, they did do that as to 42. And then the sole question is whether they adequately apprised, it's a very fair question, but whether they adequately apprised you of the licenses as to which even under your test there was construction so that your test would be fair. Our view, Your Honor, our view, Your Honor, is that they didn't adequately apprise us under our rules, specifically Section 115B1, which holds that a licensee or any party for that matter seeking relief from the error of law or the error of fact made by the subordinate Bureau with some degree of specificity. Here, because again, substantial service is determined by... Is there some degree of specificity? Is that your... Is the statute say that? The regulations have... I think it's particularity. It's... I'm sorry. 111 what? It's Section 115B1. The application for review shall concisely and plainly state the questions presented for review with reference, where appropriate, to the findings of facts or conclusions of law. So here, again, the Commission's analysis of substantial service... It doesn't refer to particularity. No, but it has to cite to the findings of facts or conclusions of law. And remember, the Commission... The finding of facts isn't obscure here. The Commission said no construction at all, period, flat, independent matter. That's right, Your Honor, but you have to understand that substantial service is determined on a license specific basis. Now, if... The Commission has just made a search for the word construction. Your Honor... I know, but I'm just trying to understand why... Your Honor, we could have done a search for the word construction, but we would still be sifting through pleadings, because we'd have to do that word search through 689 documents. I mean, Fiber Tower is taking advantage of the fact that the Bureau did not issue 689 separate orders addressing each one of those substantial services. Instead, for purposes of administrative ease, they rolled them up into one order and dealt with them all together. Fiber Tower is essentially arguing, and they're conceding, that the Commission has to make a substantial service determination on a license-by-license basis, but that Fiber Tower and its application for review is not required to identify any error committed by the Bureau on a license-by-license basis. And that makes no sense. I mean, yes, Your Honor, the Commission could have done a word search through the 689 pleadings, but I would argue that that's still sifting through pleadings under the Bartoldi Cable Standards, almost like if the Commission issues an order and cites various provisions of the Communications Act, and a petitioner files an application for review saying, you know what, you violated the Communications Act without identifying specific provisions. Now, I'd like to talk about the substantial service showings themselves, if you reach them. The substantial service showings themselves don't demonstrate that Fiber Tower actually provided substantial service. Each of those substantial service showings merely argues that Fiber Tower constructed some links, some operational links. Now remember, the substantial service standards require substantial service, not substantial investment. And so an operational link, in and of itself, doesn't demonstrate service, much less substantial service. To use an analogy, But don't you agree that your own opinion says that they didn't do what, with respect to the 42, they did do? I agree. Putting to one side whether it was adequately flagged for you, but your own decision says they just didn't do that, and it turns out they did. I agree with that, Your Honor, and had Fiber Tower flagged those 42 licenses, probably what would have happened is the Commission would have directed the Bureau to take another look at those 42 licenses, and we would have dealt with this in administrative proceedings before the agency. If Fiber Tower flagged those licenses in its petition for reconsideration, we would have looked at those licenses, but it decided not to. Instead, it decided to swing to the senses and advance its argument, rely on its argument, that it could demonstrate substantial service without constructing any facilities, providing any service whatsoever, and apparently when it got to the Court of Appeals, it had some degree of virus remorse. Now it's acting this absolutely different way. Well, what I'm saying is the question appeared in the application for review to the Commission, so it wasn't just in the Court of Appeals, it was virus remorse. Well, but, Your Honor, they decided not to identify those 42 licenses. I think the reason they didn't identify the 42 licenses is because they felt that they didn't have to. They were relying on the argument that they don't have to. There was no need. If Fiber Tower's right, if Fiber Tower's right, and the Provisioner. If the hearing were correct, there would be no need to mention it, right? If they decided that construction was totally irrelevant, they wouldn't have mentioned it at all in the hearing, would they, with respect to your case? I actually think that they were trying to just sort of optically demonstrate, this goes to Mr. Shaw's other argument, and I'll get to that in a second, that it just sort of goes, I think they mentioned that there was some construction, because in their view, the Commission was supposed to look at the totality of their investment, irrespective of whether that investment actually led to service. I think if Fiber Tower wanted to keep those 42 licenses, it would have identified those licenses. The reason we have exhaustion requirements, like Section 405 of the Communications Act, or Section 1.115B1 of our rules, is to avoid this situation. The Commission is fallible. The Commission will make mistakes, and that's why parties have to exhaust their administrative remedies before they go to the court of appeals. So I'm not following your substantial service argument, though, with respect to those 42. So if you indulge the assumption that there was adequate flagging, and I take your point that you're contesting that vigorously, but your even-if argument was that even if there was adequate flagging, then they don't get all the way home, because they have to show substantial service, just some service is not enough. That's correct, Your Honor. And my question about that is, under the terms of your own order, and as I understood your argument, if they had flagged the 42 and you had looked at it, you would have sent it back to the Bureau. Yes, I would, Your Honor. And if you don't agree with me, I will put it out there. If you do not agree with us on the 405 argument, the proper remedy would be to remand to the Commission with respect to those 42 licenses. Because it is, I will concede, it is Commission practice when a substantial service showing is filed and there's some question where the showing doesn't demonstrate that the party has actually satisfied the substantial service standard, but they've done something, and it's our practice to request additional information. Now, that said, I want to get... It's not relevant to waiver and extension. Thank you, Your Honor. That's where I was going. It's not relevant. And the reason for that is, is the Commission in its waiver and extension analysis did not rely on the fact the Fiber Tower had constructed too few licenses. Our waiver and extension analysis focused on the 689 licenses. Six hundred and eighty-nine licenses, which we assumed, perhaps incorrectly, that there was no construction or service provided. The ten licenses, Your Honor, aren't even mentioned in the order. So even if... So here's what would happen. If Fiber Tower had flagged those 42 licenses, okay, and the Bureau... We're not briefing. In this colloquy, we're assuming that it did. Okay. So if the Commission had determined that Fiber Tower... Let's just say for the sake of argument. The Commission determined that Fiber Tower satisfied the substantial service standard with respect to those 42 licenses. What it would have done is it would have just taken them out of the waiver and extension analysis. The waiver and extension analysis in the order was based on the Commission's assumption, right, that there was no construction and no service with respect to those licenses because Fiber Tower failed to satisfy the substantial service test with respect to those licenses. In the waiver and extension analysis, it gets very mushy in terms of what's within the control of the licensee and so forth, and it starts for me to see how the Commission would logically disregard service on 42 licenses when it was evaluating the equities for and against Fiber Tower. Your Honor, the 42 licenses wouldn't have been part of the analysis. Our analysis with respect to waiver would have been for... I apologize for the math. It would be 689 minus 42, so that would be like 650... 647. 647. So our analysis for waiver and extension would be with respect to the remaining 647 licenses. The 10 licenses that Fiber Tower discussed were allegedly met substantial service, although my counsel, Mr. Shaw, is correct. The Commission eventually found that it didn't provide substantial service on three of those, weren't even part of the analysis here. Those 10 licenses were sort of put off to the side in the Commissioner's waiver and extension analysis, only centered on the 689 where we found that Fiber Tower failed to satisfy the substantial service requirement. So Mr. Shaw gets no mileage. Even if you disagree with the Section 405 argument, even if you think we might have erred with respect to the 42, the 42 in no way, shape, or form... So would that be true if there were 400? I'm sorry. Suppose there were 400 as to which they were constructed. I mean, I guess you could make the same argument that with respect to 400 of them there was construction, but those were then put off to one side, and so for waiver purposes and extension purposes... That's absolutely right, Your Honor, because, again, I cannot reiterate this enough, and this is Step 4 in Footnote 155 of the order. It's also in our rules. Substantial service is determined on a license-specific basis. So the Commission's frame of analysis is to start by determining whether or not Fiber Tower met the substantial service requirement on a license. If they did, they get to keep the license. But the waiver and extension analysis is much broader. Your Honor, the waiver and extension analysis is broader with respect to the licenses where Fiber Tower failed to meet the substantial service requirement. So, again, it's on a license-specific basis. The universe of licenses that are eligible for waiver extension are those for which Fiber Tower failed to demonstrate substantial service. But don't you take into account the equities, the public equities? And if it's shown that, to use my example, if it's shown that as to 400 of them there, in fact, there was construction, then it seems like that would be taken into account in determining whether to grant a waiver. It's not taken into account, Your Honor. We would take into account, we would look at on the waiver. Our rules, our substantial service rules, require substantial service, not substantial investment. So we didn't look at the universe of 689 licenses and look at Fiber Tower's investment in the aggregate to support those 689 licenses. What we did as a first cut is determine whether or not Fiber Tower was providing substantial service on a license-specific basis. If Fiber Tower is able to demonstrate that it's at the safe harbor of four links per million population, they get to keep their license. We don't worry about that one. The waiver and extension analysis only goes to the licenses where Fiber Tower failed to demonstrate substantial service. And there, any investment that did not lead to the construction of transmission lines and the provision of service to the public by the end of the 10-year license term, or in Fiber Tower's case, 11 to 15 years, given the prior extension,  That goes to the question of spectrum in a box. Suppose that Fiber Tower has constructed these devices, which are costly and sufficient to meet all demand that they could possibly be expected to pump up through heavy advertising and so forth, heavy marketing, in the next three years. You're saying that the Commission, notwithstanding, I think it's paragraph 45 of the order, would say that that doesn't count at all, whereas constructing a lot of towers and so forth, even though they were radically underused, would. Your Honor, there is no evidence in the record that if Fiber Tower built out its licenses, they would be radically underused. Remember, there was evidence in the record. The Commission's own data shows... It is the case that no other licensee built, is that correct, in the two gigahertz band? In the 24 gigahertz band? Yes, Your Honor, and there's a good reason for that. Fiber Tower held all the licenses. Between 2007 and 2012, Fiber Tower held all but two licenses in the 24 gigahertz band. The other licensee was Puerto Rico Telephone Company, and Puerto Rico Telephone Company demonstrated substantial service for those licenses in 2011. As I understand it, there are three other licensees in the 24 gigahertz band now. They hold a handful of licenses. One of those licensees, a company called M&M Brothers, recently filed substantial service showing. One of their lessees is providing wireless backhaul in the 24 gigahertz band. Let's talk about Fiber Tower for a second, okay? Fiber Tower argues that there was no demand for service in the 24 gigahertz band. That is undercut by data in the record. The record evidence shows national demand for wireless backhaul, and Fiber Tower, while they come in and argue that demand is on a market-by-market basis or a service-by-product market, they didn't put any evidence in the record to demonstrate that. Moreover, as footnote 49 of the Order on Reconsideration explains, Fiber Tower had built and was providing service on 100 links in the 24 gigahertz band in Washington, D.C. It also had 27 links built in the 24 gigahertz band in Baltimore, Maryland. Fiber Tower had 400 commercial-grade systems sitting in its warehouse. The Commission looked at Fiber Tower's evidence concerning the lack of demand and concluded that it didn't withstand scrutiny. Fiber Tower told a bankruptcy court in Texas in 2011 that it was foregoing capital expenditures because it had a cash flow problem. It lost two of its biggest customers, and it decided to service its debt rather than deploy facilities to be sealed. Now, on the spectrum of the box issue, I go back to the fact that the Commission's rules, the 24 and 39 gigahertz orders, in no way issued construction and service requirements. Our rules require a licensee, at a minimum, to demonstrate an existential service showing that it's providing some service to the public and to describe the populations and the geographic areas served as well as the operational status of the facilities it's constructed. We allow licensees to submit other information, but at a minimum, they have to make that showing. Fiber Tower... It doesn't... I mean, that's the way you characterize it, and that seems to be a rational way to construct a scheme, but the rules just don't say that. They don't say, at a minimum. It would have been very easy to construct a rule that says, everybody has to show a link or everybody has to show construction, period. That's a minimum. But they just don't say that, as far as I can tell. Your Honor, I'm looking at Rule 101.17 concerning the 39 gigahertz band, and it says, a licensee's substantial service showing should include, but not be limited to. So it's not at a minimum, but it should include. It should include this information. The Commission is telling you that you should tell us the facilities you've constructed and the service you've provided. Of course. Of course the Commission would want to know that, and of course any applicant would have to submit that because that's going to be their best argument. Your Honor, as you well know, the Commission's reasonable interpretation is entitled to substantial deference from this Court, and Fiber Tower... Fiber Tower's argument really boils down to the Commission's rule is stupid. It doesn't work for our business plan. Okay? So it's out of date. Pardon me? It's out of date. It's out of date. But they do have... Except they didn't anticipate it in the original orders on the 24 and 34... And that might be well and good, but the Commission has consistently, consistently, through its orders, its rules, its precedent interpreting its rules, we cite in our brief another decision from the Commission applying the substantial service requirement in a different spectrum band. This is at pages 33 and 34 of our brief. And if that decision makes clear, to demonstrate substantial service, there has to be the construction of some facilities, perhaps construction less than the benchmark articulated by the rule, coupled with the actual provision of service to the public. So I asked about this definition of 24 gigahertz service in 101.3, and you all didn't cite that, and it may just be that it's not germane. But is there a reason it's not germane if it talks about... It defines 24 gigahertz service, and I take it to... Part of your argument is to have substantial service, you have to have service. And it seems to speak in terms of a completed length. It is germane, Your Honor, and it's entirely consistent. I mean, this is my point. The Commission, it is germane. Is there a reason you all didn't rely on it? Because it just seems... Unless I'm misreading it, it seems to be maybe the best textual indication that service contemplates actual working lengths. That's a failure by appellate counsel, Your Honor. There's no reason other than that that we did not rely on it. I didn't think of it. But going back to this, Fiber Tower is making this argument that the Commission's interpretation of the substantial service requirement in our rule is inconsistent with the rules promulgated. The Fiber Tower cannot point to a single instance where the Commission and the 24 or 39 gigahertz ban, or any other spectrum ban for that matter, has found that a licensee that constructed no facilities and provided no service to the public provided substantial service. Now, let's talk about the spectrum in the box program for a second. Fiber Tower is essentially arguing, Look, your rule is dated. It doesn't make sense given our business plan. We're ready to go. We're ready to go, and it makes no sense whatsoever to require us to construct length simply to meet the requirements of your outdated rule. You should allow us to keep the spectrum to deploy our spectrum in the box facilities when a customer comes along. That's actually inconsistent with the substantial service requirement. When you read the 24 and 39 gigahertz orders, which were promulgated to effectuate Section 309J4B of the Act, there's a clear anti-spectrum warehousing fence in there. Section 309J4B directs the Commission to adopt performance requirements like the substantial service requirement to prevent spectrum warehousing. If we allow licensees like Fiber Tower to hold their licenses indefinitely until a customer came along, that spectrum could lie shallow. Suppose that the Commission is investing both in the hardware necessary for the spectrum in the box and in the marketing of the spectrum in the box. Suppose its investments in those areas are quantitatively as much as would have been involved in a conventional situation to meet at least any notion to refute any notion that there would be warehousing. Why would the principle not extend to spectrum in the box? Your Honor, I think we disagree about what spectrum warehousing means. From the Commission's view, when spectrum is lying shallow, when it's not being placed into productive use, that's spectrum warehousing. So if Fiber Tower is sitting there and it's making every effort, right? It's developed this innovative spectrum in a box product and it's marketing its service really, really well and nobody comes along and takes that product, nobody buys it, the spectrum isn't being placed into use. That's spectrum warehousing. That doesn't sound like warehousing to me. Your Honor, it probably... It may show lack of marketing, but I don't see how it shows warehousing. Your Honor, what if Fiber Tower is providing a service that just isn't very good? What if customers don't want Fiber Tower service? The reason that we have... I didn't see that as a contention being made. No, I know that contention isn't being made, but the reason that we have the service rule is because we don't... It's impossible for the commission to determine that we don't run a beauty contest among licensees' business plans. The substantial service requirement is embodied... It's sort of adopted in the 24 and 39 gigahertz orders. It's a balancing. What we did is we eschewed specific construction requirements and we eschewed construction milestones and instead allowed licensees to demonstrate substantial service at the end of the 10-year license. So licensees like Fiber Tower can develop spectrum in a box and they can market their services and they can develop customers and they can develop a billing system and do all of those things. But at the end of the 10 years, they should be able to do that. And if they can't, it might be just that nobody wants to... So it sounds like what you're saying is, and this also seems rational, at least conceptually, that you're using actual links used by customers as a proxy for an effective use of the spectrum. And if that's your objective, then if somebody, if one of the entities, does one save-build link... I may be getting the terminology completely wrong, but I think you know what I'm getting at. If somebody does one save-build link and that's enough to foresaw termination of the license, then what have you really gotten? Your Honor, there was no evidence in the record that these, in fact, were save-build links. Our rules... But I think the way that the Bureau approached it and the way that you all affirmed it, the Commission affirmed it, excuse me, it seemed like as long as there would have been that, that would have been enough and then the license would not have been terminated. That's correct, because Fiber Tower is disparaging when other licensees provide it. They're saying it's a save-build, it's wasteful, it's antiquated, et cetera. The difference is that those licensees have constructed facilities and are providing service to the public, and the spectrum covered by their license is being placed into productive use. Fiber Tower's spectrum is not. And that's the balancing that the Commission made. The Commission provided Fiber Tower a great deal of flexibility with respect to the milestones and the construction required, but at the end of 10 years, or in Fiber Tower's case, at the end of 11 or 15 years, at some point, Fiber Tower's business plan has to materialize, and if it doesn't, there's nothing unreasonable with the Commission enforcing the build-out requirements and its rules. Also, with respect to this demand issue, there was no evidence in the report that demand was lacking for wireless backhaul. I go back to the fact that the Commission's own data shows that there has been a significant increase in demand for wireless backhaul. And the Fiber Tower, I'm sorry. No, their argument is, where? Where is the demand? Just because there's demand in one place doesn't mean there's demand. Well, Your Honor, presumably if Fiber Tower felt that there wasn't demand in Tulsa, they could have identified that market to the Commission. Right? Fiber Tower came in and argued that national demand was lacking. It's only when Fiber Tower got to the appellate stage did Fiber Tower make this unsubstantiated argument that demand was lacking in specific geographic markets or that there was a difference in the technologies provided by difference in demand for wireless backhaul provided in different sector bands. I've looked at Fiber Tower's brief, and other than just sort of conclusory statements filed by their equipment vendors and other companies that were serving Fiber Tower, the only thing I could find was an untimely supplement to Fiber Tower's application for review. I believe it's at 568 and 567 through 569 in the joint appendix. And all it does is describe Fiber Tower's business plan and how it was migrating from macro cell wireless backhaul and the 11, 18, and 23 gigahertz bands to this new small cell network and the 24 and 39 gigahertz bands. But Fiber Tower never undercut the Commission's finding based on its own data that there was sufficient demand for wireless backhaul in all sector bands in all markets. Anything further? No, Your Honor. Thank you very much. Thank you. All right. Counsel, if you want a few minutes, a couple of minutes. Thank you, Your Honor. If I could make just one quick factual point and then two legal points. As to the factual point about the 24 gigahertz licensees, I'm reading from the Commission's own October 2014 notice of inquiry. In 2004, this is what happened in the 24 gigahertz band. Fiber Tower was the holder of the majority of licenses and there were two other licensees in the 24 gigahertz band which held six other licenses, no build-out during the relevant time on the six licenses. And here I'm going to just quote from the Commission's own 2014. In 2004, the Commission held auction 56 in which it made 890 24 gigahertz licenses available. Only seven of the 890 licenses were sold. Fiber Tower bought one of them in addition to the ones it already had. Two licensees bought the sixth other. None of them built out. The other 883 licenses went unauctioned, and if you look in the secondary literature, it's viewed as one of the biggest failures in Commission history in terms of an auction. The reason, there wasn't demand. Nobody wanted to buy these licenses because there wasn't a demand in the market to build these out. Now, on to the two. So when the Commission says its own data shows there was plenty of demand in the 24 gigahertz spectrum, they don't have a single build-out in that spectrum to point to, and they have 883 of these licenses sitting in the Commission's own hands. I don't know what data they're speaking of that there was sufficient demand in the 24 gigahertz band for wireless backhaul. Now, on to the two. Is their math correct that put aside the 883 as to which there was no forward-looking auction that was successful? With respect to whether this is beforehand, are they right that you owned all the licenses except, so you owned 600? We owned, there were 94 issued here. We owned a total of 122 24 gigahertz licenses. And then the other licensees totaled on six. There's six others. So you had 102 out of 108. That's right, that are in the market. Of course, there are many more that are available that no one wants to buy. Now, as to the two legal points, the first one, the preservation point, I'm going to cite the four authorities that the Commission cites in their brief for why it was waived, despite the fact that we have an argument heading in our application for review that points out the fact that they disregarded the construction on the licenses that issued. They cite Bartoldi, this case, they cite three of this court's cases, Bartoldi, Environmental LLC, and Quest. All three of those cases are about presenting arguments to the Commission. When she says they don't have to sift through pleadings, all three of those cases were referring to arguments that were made to the Bureau in which the party then did not make the argument to the Commission but simply cited the record writ large. And what the court said in all three of those cases, you don't preserve an argument before the Commission simply by attaching or citing other pleadings. We're not going to force the Commission to go find arguments by reading other pleadings. That's completely an opposite to what we have here, where the argument was clearly presented and the question is the support for that argument, does the Commission have to find it when the Commission knows exactly where to look for it and it's in the same spot in each of those licenses. And the other thing they cite is regulation, the 115B1, which says you have to clearly present, concisely present, the application review shall concisely and plainly state the questions presented for review. The question was clearly presented for review. Now, the fact that they did this in an en masse 689 mass cancellation of licenses for administrative ease, which is the word that Ms. Flood used, the fact that they did that for administrative ease does not excuse the fact that this is a license by license showing. Now, as to the waiver, that's the preservation issue, as to whether it affects the waiver and extension analysis, first of all, it's not accurate to say that the Commission's order did not look at the fact that FiberTower did not build out on the licenses. If you look at that order, paragraph 23 of the order on JA61, first sentence, in this regard, we note that the Bureau concluded, FiberTower chose not to build facilities in advance of the deadline because it did not want to squander its financial resources. If you look on paragraph, that's in the extension analysis. If you look at paragraph 35, JA607, in the waiver analysis, quote, FiberTower made the decision not to build out its licenses when it would have only cost them X and Y. Now, the reason why I think it does affect the analysis, waiver and extension is a much broader inquiry than substantial service. It is an equitable inquiry. It looks at the public interest. Judge Cheneybossom's hypothetical is directly on point. If there were, say, 400 licenses at issues in which FiberTower had construction, there is no way the commission could have written the extension and waiver analysis that it wrote, even as to the remaining 200 odd licenses, because that waiver and extension analysis was predicated on the fact that FiberTower was simply sitting on its rights and not building where market demand existed. At some point, there's a tipping point as to the number of licenses that they had built out showed that, in fact, FiberTower was doing productive things. Whether that tipping point is 40 or 400 is not for, I don't think, this court or for commissions of telecouncil to decide. It's for the commission to decide. The commission has to look at the waiver and extension analysis on an accurate record. It should be vacated for a new analysis on all of those. And the last point I'll make is Ms. Flood says, well, the commission doesn't look at any licenses on which the party has already demonstrated substantial service. It only has tunnel vision on the number of licenses that there was no construction on. So it's only going to look at the remaining licenses. That conflicts with the commission's own brief, appeal brief here, when it's distinguishing the two light speed case. Page 54 of the commission's brief says, and it's distinguishing light speed, why a waiver was justified in the two light speed case and not this case. Here's what the commission says on page 54. Two light speed had built out the majority of its licenses, and so an extension was warranted on the remaining licenses. So its distinction of that decision is based on the very predicate of Judge Trinivasan's question, that is, if they build on other licenses, isn't that relevant to the waiver and extension theory? I think it has to be. It only makes sense, and it contradicts the commission's own words. So we think it has to be vacated not only to the 42 licenses at issue, but as to the group as a whole. Thank you. Thank you, Your Honor. We'll take the case under advisory.
judges: Rogers, Srinivasan, Williams